**CABLE INVESTMENTS, INC., Plaintiff,**

v.

**Mark WOOLLEY, et al., Defendants.**

**Civ. No. 85–1305.**

United States District Court,
M.D. Pennsylvania.

Dec. 29, 1987.

Harvey Freedenberg, H. Lee Roussel, Robert H. Griswold, McNees, Wallace & Nurick, Harrisburg, Pa., for plaintiff.

L.C. Heim, Dell'Alba, Heim & LeCates, York, Pa., Donald H. Brobst, Roseen, Jenkins & Greenwald, Wilkes–Barre, Pa., Nora Garriote, Mark J. Tauber, Deborah C. Costlow, Piper & Marbury, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

KOSIK, District Judge.

This action was commenced with the filing of a complaint containing twelve counts based on the termination of plaintiff as a provider of cable television programming to the tenants of two apartment complexes either owned, operated or controlled by defendants. Counts I through IV, and VI have been withdrawn. The remaining counts allege violations of plaintiff's free speech rights under both the United States Constitution and the Constitution of the Commonwealth of Pennsylvania, Counts V and VII; tortious interference with existing and prospective contractual relations with plaintiff and its subscribers, Count VIII; conversion, Count IX; interference with plaintiff's reasonable expectations to continued access, Count X; and violations of the Pennsylvania Landlord Tenant Act and the Cable Communication Policy Act of 1984, Counts XI and XII.

Four of these counts have been challenged on the eve of trial by the defendants' motion in limine. Specifically, the defendants claim that the complaint fails to state a cause of action upon which the court can grant relief on Counts V and VII. Next, defendants urge that plaintiff has no standing to bring an action under Counts XI and XII, and if standing should be found, [1] what, if any, legal rights to access private property is given to a franchised cable operator under Section 541(a)(2) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 et seq., [2] what, if any, legal rights do franchised cable television operator have under the Pennsylvania Landlord and Tenant Act, 68 P.S. § 250.101 et seq., to access private property.

## BACKGROUND

The plaintiff, Cable Investments, Inc., offers cable television in York Township, Pennsylvania, pursuant to a non-exclusive franchise granted to it by the governing body of York Township. As part of its operation, plaintiff provided its service to subscribers to include tenants at apartment complexes known as Coventry at Waterford and King's Arms at Waterford.

Defendant Woolley is an adult with his principal place of business in York. Woolley owns interests in MGM Enterprises, Inc., First Investors General, Inc., Waterford Associates, and Cold Springs Associates. Defendant Waterford Associates owns the aforesaid Waterford apartment complexes.

Since prior to 1979, plaintiff, through its predecessor, Keystone Communicable, Inc., provided cable television to Coventry at Waterford. The programming was provided through signals transmitted via drop lines within individual buildings. Since 1984 plaintiff provided similar service to the apartment complex under construction at King's Arms. Before plaintiff acquired Keystone Communicable, Inc., the latter operated with an understanding as opposed to a written agreement. No written agreement existed, and none was transferred to plaintiff by Keystone in the agreement of purchase. The understanding forming the basis for the service provided that either side could terminate upon sixty [60] days notice to the other party. It was based on this understanding that plaintiff expended money for the installation of necessary equipment to provide its cable service to tenants.

Defendant MGM owns and operates a television system at the Waterford apart-

ments. Defendant Woolley is an officer of MGM and manages its affairs.

During July 1985 plaintiff was informed by counsel for Waterford Associates that it would be required to remove its cable television communications at Coventry and King's Arms. Tenants were advised that plaintiff would no longer be a provider to them. Plaintiff refused to disconnect its system. Regardless, plaintiff has been refused access to the tenants with its programming. Defendants' have threatened plaintiff with arrest and civil or criminal penalties if they enter on the premises of the apartment complexes.

## I.

■ In Counts V and VII of the complaint plaintiff charges the defendants with violating the free speech and First Amendment rights of the tenants and plaintiff under the Federal and Pennsylvania Constitutions. Count V states that the defendants conduct in threatening civil action, arrest and criminal prosecution was sanctioned by and taken under color of state law. Count VII merely alleges that the defendants' conduct and agreements constitute a violation of plaintiff's rights under Article 1, Section 7 of the Pennsylvania Constitution.

Recently, the Supreme Court has stated that since cable television partakes of some aspects of speech and the communication of ideas, it would seem to implicate First Amendment interests. *City of Los Angeles v. Preferred Communications*, 476 U.S. 488, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986). There appears to be no dispute that plaintiff has such rights here. Nor does there appear to be any dispute that an individual [including defendants] cannot abridge one's First Amendment rights absent some conduct which stems from state action. Indeed, plaintiff asserts that the key issue which must be resolved by the court in considering plaintiff's claim for relief pursuant to the First Amendment is whether "state action" is present.

The Supreme Court has not adopted a single standard to ascertain the existence of state action in the affairs of private parties. A number of approaches have been promulgated through case law, and the district courts are obliged to investigate and determine if the facts are applicable to any one of them. These approaches to determine whether state action exists have been variously characterized, but grouped into three categories: [1] where there is a symbiotic relationship between a private actor and the government, [2] where there is sufficient nexus between the actor and the government, and [3] where the actor has assumed a public function making it an arm of the state for constitutional purposes. *Community Medical Center v. Emergency Medical Services*, 712 F.2d 878 (3d Cir.1983); *Parks v. "Mr. Ford"*, 556 F.2d 132 (3d Cir.1977); *Magill v. Avonworth Baseball Conference*, 516 F.2d 1328 (3d Cir.1975); *Smith v. Duquesne University*, 612 F.Supp. 72 (W.D. Pa.1985), *aff'd*, 787 F.2d 583 (3d Cir.1986). Assessing the defendants' conduct in light of the three approaches, we must conclude that there was no state action in the relationship of the parties.

In the first instance, there can be no basis for claiming that a symbiotic relationship existed. There was no statutory or financial relationship with the state, and the government cannot be said to have exercised any control over or influence over the operation of the business of defendants.

As to the nexus approach we must inquire if the state could be deemed responsible for the specific conduct of which the plaintiff complains. It could hardly be said that such state responsibility exists in the defendants' act of disconnecting the cable system established by the plaintiff, or in the defendants' threatened enforcement of their rights through civil or criminal remedies. In *Crozer Chester Medical Center v. May*, 352 Pa.Super. 51, 506 A.2d 1377 (1986), involving free speech rights under Article 1, Section 7 of the Pennsylvania Constitution, the court held that there was no greater right afforded under the Pennsylvania Constitution than has been afforded free speech rights under the United States Constitution. In an effort to protect

private property rights there were actual arrests, threats of trespass action, and the granting of a preliminary injunction by the court. It was held that under the circumstances this conduct neither created a symbiotic relationship nor established a nexus between defendants and the state government. The Supreme Court in *Blum v. Yaretsky*, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785–86, 73 L.Ed.2d 534 (1982), a case in which plaintiffs sought to hold state officials liable for actions of private nursing homes, alluded to those cases in which the defendant is a private party and the question is whether his conduct has sufficiently received the imprimatur of the state so as to. make it "state action." In discussing the nexus approach the court held that "the purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the state is responsible for the specific conduct of which the plaintiff complains." Further, "... our precedents indicate that a state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the state."

Plaintiff erroneously relies in part on *Wilco v. Electronic Systems, Inc.*, 50 Bucks L.Rep. 243 (1987), a case in which a cable television company with an exclusive contract sought to enforce its agreement against another cable company which entered an apartment complex to service tenants. The Bucks County Court held that to enforce such an exclusive contract through the courts would be the execution of "state action" which would in turn violate the First Amendment of the United States Constitution. The court cited *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) as its authority. The latter overturned a state court's enforcement of an agreement or covenant in a deed which contained a racially restrictive covenant. Plaintiff would urge that the defendants' threatened court action is tantamount to the court action in *Wilco*. They also argue that the defendants' conduct is discriminatory. We disagree. Regardless, the de-

fendants argue that the Bucks decision is a misapplication of *Shelley v. Kraemer*. With due respect to the views of the Bucks County Court, we are constrained to agree with the defendants. In *Parks v. "Mr. Ford"*, 556 F.2d 132, 136, n. 6a (3d Cir. 1977), the court noted a distinction when "state action" is deemed to exist for constitutional purposes and when it does not exist. The court stated that where state courts take action to enforce the right of private persons which are permitted but not compelled by law, there is no state action for constitutional purposes in the absence of a finding that racial discrimination is involved as under the doctrine of *Shelley*, supra. It is evident that there was no state court action taken by defendants in our case. It is non-existent, and even if actions had been taken in the state courts, there is not a hint of racial discrimination.

The plaintiff finally urges that the third approach, i.e., where the actor has assumed a public function making it an arm of the state for constitutional purposes is applicable here. Again, we disagree. Plaintiff states "that while Waterford may not be a 'company town' as in *Marsh v. Alabama*, 326 U.S. 501 [66 S.Ct. 276, 90 L.Ed. 265 (1946)], ... it does contain many elements found in a company town and is, in fact, a self-contained community equivalent, in many respects, to such an entity." Plaintiff proceeds to compare the attributes of the defendant apartment complexes to a company town which *Marsh* held had assumed a public function. It would certainly take a broad brush to paint such a comparison here. At one point, the Supreme Court characterized the similarities between the business district of a company town in *Marsh* and a shopping center as "striking." *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 317, 88 S.Ct. 1601, 1608, 20 L.Ed.2d 603 (1968). In so concluding they extended the free speech rights to a shopping center on the authority of *Marsh*, supra. It was not until *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) that this extension of First Amendment rights

to shopping centers was overruled. Nor do we believe that Waterford is comparable to migrant labor camps. The attributes of the apartment complexes here are no more distinctive than those of any other apartment complexes. Those attributes do not convert a privately owned living community into a public or quasi-public forum.

Plaintiff seeks similar relief under Article 1, Section 7 of the Pennsylvania Constitution. As we understand it, plaintiff offers that because a state court is free to read provisions of its constitution more expansively than comparable federal provisions, that Pennsylvania has conferred greater rights than those established under the federal decisions. While plaintiff is correct in its initial premise, we do not believe it is correct in its conclusion as to the extension of rights with respect to Article 1, Section 7 in the circumstances existing here. *Western Pennsylvania Socialist Workers v. Connecticut General Life Insurance Co.*, 335 Pa.Super. 493, 485 A.2d 1 (1984), *aff'd* 512 Pa. 23, 515 A.2d 1331 (1986) involved a shopping mall. In refusing to extend protected free speech to privately owned stores, the court stated that "if, as appellants contend, the requirement of state action is less stringent when interpreting the provisions of the Pennsylvania Constitution, as opposed to the Federal Constitution, it is nevertheless clear that the provisions of Article 1, Section 7 do not reach the acts of *purely* private actors." *Id.* 485 A.2d at 5. The court would not apply the holding of *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981), also cited by plaintiff here, because *Tate* was limited to a situation in which an educational institution had held itself out to the public as a community resource and cultural center which allowed members of the public to enter its campus to use its facilities as a public forum. The Superior Court adopted the three approaches alluded to by us earlier, *Community Medical Center*, supra, as helpful in its analysis, and as consistent with Pennsylvania law. The Pennsylvania Supreme Court in affirming refused to apply the company town analysis, *Marsh v. Alabama*, supra, and found *Hudgens v. NLRB*, supra, to be correct and persuasive under the Pennsylvania Constitution.

We find no basis for relief to plaintiff under either the United States or Pennsylvania Constitutions, and conclude that they have failed to state a cause of action upon which relief could be sought under Counts V and VII of the complaint.

## II.

Next, we will address the defendants' claim that plaintiff has no standing under Counts XI and XII.

Plaintiff claims that it has a right to seek judicial enforcement of rights—"private enforcement is mandated and proper"—which Congress specifically enacted and intended to benefit cable operators in their efforts to provide service to tenants desiring such service. Of course, plaintiff speaks of the Cable Communications Policy Act of 1984 [Cable Act], and specifically 47 U.S.C. § 541(a)(2), which as enacted provides in part as follows:

> "any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which has been dedicated for compatible uses, except that in using such easements the cable operator shall ensure— ..."

Plaintiff claims the right to access under this provision. In Count XII of the complaint, plaintiff states that because defendants are denying this access we ought to give it relief.

That the Cable Act is being violated does not in itself give rise to a private cause of action in favor of one being aggrieved. *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Here, plaintiff claims that the fact that it has a right to access under Section 541(a)(2) results in a private right of action to enforce such access. Defendants, on the other hand, claim that Section 541(a)(2) does not bestow a right to a private right of action, but that any enforcement of the Act was intended to be in the

hands of the franchising authority based on uniform standards and policies, 47 U.S.C. § 521(2) and (3), and because the franchising authority includes any governmental entity empowered to grant a franchise, Section 522(9), along with the authority to regulate Sections 531(c), 542(d), 543 and 544.

Plaintiff relies on a number of decisions to support its claims. *Rollins Cablevue, Inc. v. Saienni Enterprises,* 633 F.Supp. 1315 (D.Del.1986); *Greater Worcester Cablevision, Inc. v. Carabetta Enterprises, Inc.,* Util.L.Rptr. (CCH) ¶ 24,886 (D.Mass. Nov. 20, 1985) [Available on WESTLAW, 1985 WL 17376] and *Cable Holdings of Georgia v. McNeil Real Estate Fund VI,* 678 F.Supp. 871 (N.D.Ga.1986). Except for *Rollins,* all of the decisions discussed plaintiff's access rights under Section 541(a)(2), but the private right of action issue based on Section 541(a)(2) was not raised. In *Rollins,* the court had an application for injunctive relief as well as a claim for access under Section 541(a)(2). The injunction was sought by a franchised operator against an unfranchised system. After reviewing the legislative history of the Cable Act to include the establishment of a national policy that clarifies a system of local, state and federal regulation of television, with emphasis on local franchising as a primary means of cable television regulation; after reviewing the provision under which access to the courts is provided, and after alluding to the Communications Act of 1934, of which the Cable Act is an amendment, which traditionally was viewed as not providing for private rights of action, Judge Roth concluded that local franchising authorities are intended to be the regulators and enforcers of the Cable Act, and that court remedies were provided in very limited instances. *Id.* 633 F.Supp. at 1319–1320. Judge Roth concluded that there was no intent, express or implicit, to create a private right of action in a cable operator to enjoin an unfranchised rival cable operator. In separately considering the plaintiff's right to access, and without reference to the limited instances of court remedies, the court concluded that Section 541(a)(2) provides for access to a franchised

operator. In granting a preliminary injunction the court opined "it would seem likely that Rollins will be able to prevail in its claim of right to access, under the provisions of the Cable Act and the Delaware Regulation of Television Systems Act, 26 Del.C. § 601 et seq. which creates a franchising authority...." *Id.* 633 F.Supp. at 1322. It is worth noting that the Delaware statute itself provides access for an operator as well as just compensation to an owner. Pennsylvania does not have a comparable piece of legislation.

We conclude that the Cable Act does not expressly provide for a private remedy, but intends that enforcement should be left to the franchising authority. To determine whether a private cause of action is implicit in a federal statute not expressly providing one, the Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), espoused a four prong test to discern congressional intent.

The threshold consideration under *Cort* is whether plaintiff is one of the class for whose special benefit the statute was enacted. In this regard, the Supreme Court has noted that the most accurate indicator of whether a privately enforceable remedy should be implied is the duty or right creating language in the statute itself. *Cannon,* 441 U.S. at 690, n. 13, 99 S.Ct. at 1954–55, n. 13. In stating the purposes of the Cable Act, Section 521 tells us, among other things, that it was to establish a national policy, to establish franchise procedures and standards to assure growth and response to the needs of the local community and to establish guidelines for the exercise of federal, state and local authority with respect to regulation. Such language certainly evidences an intent of establishing a national policy to benefit the public at large. In the process, benefits will result to various interests, but it cannot reasonably be understood that Congress sought to provide special benefit to cable companies. Where their private rights needed vindication, as in the case of a denial of a renewal or modification, Congress has specifically provided for it in Sections 545 and

546. No other private right to court action was intended.

The second question under *Cort* is whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one. In responding, a review of the legislative history is helpful. The House of Representatives Report, No. 98–934, 98th Cong., 2d Sess., reprinted in 1984 U.S.Code Cong. and Admin.News, 4655 et seq. tells us that the municipal franchise commonly specified the nature of the cable system to be constructed, and that the purpose of the Act was to continue reliance on local franchising as a primary means of regulation; that this was a critical role which should be preserved to include the local role of regulating through the franchise process. It required that the service be made available in all areas of a city so that residents of lower income areas are not deprived of cable service. *Id.* at 19 and 20, 1984 U.S.Code Cong. & Admin. News at 4656–4657. At the heart of the legislation was the need for national standards which clarify the authority of various levels of government; the ability of a local government entity to require particular cable facilities was enhanced by granting it powers necessary to tailor facilities to the needs of the community. *Id.* at 26, 1984 U.S.Code Cong. & Admin.News at 4663. In addressing franchising and regulation, the House Report speaks of granting a franchising authority the power to provide terms and conditions related to the grant of a franchise such as the duration of the franchise term, delineation of the service area, the construction and operation of the system, and the enforcement and administration of the system. *Id.* at 59, 1984 U.S. Code Cong. & Admin.News at 4696. While these references are selective, we believe them to be representative. Our review did not disclose a legislative intent to grant individuals the right to enforce the Act or regulations.

Under *Cort's* third prong, we are to inquire if it is consistent with the underlying legislative scheme to imply the remedy plaintiff claims to exist. We think it is not consistent. The Cable Act, as indicated earlier, is an amendment of the Communications Act of 1934, which vested authority in the Federal Communications Commission. Under the Act of 1934 the courts traditionally ruled that it did not create private rights of action. *See Rollins, Id.* 633 F.Supp. at 1319.

The final question of the *Cort* test is whether the cause of action is one traditionally relegated to state law, in an area basically the concern of the states, so that it would be inappropriate to infer a cause of action based solely on federal law.

We believe the issue plaintiff seeks to litigate, i.e.: whether a right to access exists over public rights-of-way and through easements—dedicated for compatible uses, is an issue traditionally left to be determined by the common law or statutory law of the states. This is further enforced by the emphasis on local authority involvement in the granting of franchises. Having granted plaintiff a franchise, the local franchising authority has it within its power to determine, as well as enforce, plaintiff's rights under applicable state law.

Having considered the relevant considerations proposed by *Cort*, the result dictates against implying a private federal remedy to enforce access under Section 541(a)(2) of the Cable Act.

Finally, defendants challenge the standing of plaintiff to pursue a claim under Section 250.554 of the Landlord and Tenant Act of 1951, as amended, 68 P.S. § 250.101 et seq.

In Count XI plaintiff alludes to Section 250.554 as providing in pertinent part that:

"It is the intent of this article to insure that the landlord may in no way restrict the tenant's right to purchase goods, services and the like from a source of the tenant's choosing and as a consequence any provision in a written agreement attempting to limit this right shall be void and unenforceable in the courts of this Commonwealth."

Claiming to be a third party beneficiary of this provision, plaintiff seeks to enjoin defendants in the alleged summary termination of plaintiff's cable television service.

■ Plaintiff now also asserts standing as a real party in interest under Fed.R.Civ. P. 17(a). However, Count XI identifies plaintiff's role as a third-party beneficiary, and makes no additional allegations upon which to assess the present claim. The pretrial memorandum similarly represents that the "threshold question in the case concerns a tenant's right in Pennsylvania to receive the cable television programming of his choice and the right of the provider of such programming to provide such services upon request of the tenant." No independent basis for the action under the Tenant Act is asserted. In the circumstances, we do not believe that the tenants rights section, Section 250.554, can be read as creating any interest in cable television operators.

Defendants challenge the right of plaintiff to bring the action under the Tenant Act because it does not enjoy third party standing and is not a third party beneficiary. Plaintiff claims that its relationship here gives it real party in interest status. Both sides have extensively briefed their positions which most strongly advocate against each other.

Since we believe the outcome of this issue will directly depend on the rights of a tenant, it will aid us to add a portion of Section 250.554 which represents the substance of "Tenants Rights" added to the Landlord and Tenant Act by the Pennsylvania legislature in 1974. This portion of Section 250.554 immediately precedes that quoted earlier herein as part of the plaintiff's claim in Count XI. It states:

"The tenant shall have a right to invite to his apartment or dwelling unit such employees, business visitors, tradesmen, deliverymen, suppliers of goods and services, and the like as he wishes so long as his obligations as a tenant under this article are observed. The tenant also shall have right to invite to his apartment or dwelling unit, for a reasonable period of time, such social guest, family or visitors as he wishes so long as his obligations as a tenant under this article are observed. These rights may not be waived by any provisions of a written rental agreement and the landlord and/or owner may not charge any fee, service charge or additional rent to the tenant for exercising his rights under this act."

Although there may be a conflict in the authorities, we believe there is a sound basis for disposing of the issue concerning the plaintiff's standing to bring an action based on the rights of tenants under the Landlord and Tenant Act. In this regard, plaintiff relies on *Stephenson v. Diversified Holdings Corp.*, No. 5144 Equity 1983 (C.P. Berks, Aug. 24, 1983, *aff'd* No. 01364 Phila. [slip opinion] 1983 [Pa.Super. Dec. 14, 1984]), and *Wilco Electronic Systems, Inc. v. Davis*, supra. The latter, while erroneously addressing the First Amendment issue involved in this case, also concluded that Section 250.554 guaranteeing tenant rights included the right to purchase cable television services of their choice. Plaintiff's complaint seeks to establish it as a beneficiary of the tenants rights as established by the rental arrangement. In this context, the plaintiff's right is derived from the right of the tenant.

We hold, with more persuasive authority to the contrary, that tenants do not have a right to purchase cable television of their choice. Accordingly, plaintiff has no standing as third-party beneficiary of the tenants agreement with their landlord. *The T–C Harrisburg Company and The T–C Harrisburg East Company v. Sammons Communications of Pennsylvania, Inc. and Sammons Communications, Inc.*, No. 3670 S 1984 (C.P. Dauphin County, July 6, 1987). In this case Judge Dowling found the above authorities unpersuasive and concluded that Section 250.554 was not intended to include cable television service. Further, that there was no tenant ownership interest vested in the cable fixtures as an implied right essential to the use and enjoyment of the premises. Judge Dowling refused access to franchised cable operators by granting ejectment relief. This ruling was followed in *Weaver v. Dallmeyer*, No. 86–SU–02510–07 (C.P. York County, October 16, 1987) which holds that Section 250.554 of the Tenant Act does not authorize a tenant to select cable television services where it would necessitate a permanent physical occupation of the landlord's private property in violation of the Fifth

and Fourteen Amendments to the United States Constitution. In *Weaver*, one of the plaintiff's was the plaintiff in the instant case. There, as here, the court denied Cable Investments, Inc., the right to enter upon the landlord's private property at the instance of tenants.

Having determined that plaintiff's right does not rise any higher than the right of the tenant, we need not reach an additional and more complex issue dealing with the right of plaintiff to physically occupy, on a permanent basis, the private property of a landlord without providing just compensation. *See Loretto v. Teleprompter Manhattan CATV Corporation*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

## CONCLUSION

Since it has been determined that plaintiff cannot prevail as to Counts V and VII, and that it has no standing to bring a private action under the Cable Communication Policy Act of 1984 or as a third-party beneficiary to the rights of a tenant under the Landlord and Tenants Act, Counts XI and XII, the defendants' motion in limine seeking dismissal of Counts V, VII, XI and XII will be granted.

At the trial of this matter no evidence pertinent to such claims will be submitted.

SO ORDERED.